## CF&I STEEL CORPORATION, Petitioner,

### v.

### Rogers C. B. MORTON, Secretary of the Interior, Respondent,

### and

### Local Union No. 9856, United Mine Workers of America, and International Union, United Mine Workers of America, Intervenors.

### No. 74–1390.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 22, 1975.

Decided May 19, 1975.

Rehearing Denied July 14, 1975.

Thomas G. Brown, Denver, Colo. (John F. Welborn and Welborn, Dufford, Cook, & Brown, Denver, Colo., on the brief), for petitioner.

Michael Kimmel, Atty., Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., and Robert E. Kopp, Atty., Dept. of Justice, on the brief), for respondent.

Joseph A. Yablonski and Steven B. Jacobson, Washington, D. C., for intervenors.

Guy Farmer, William A. Gershuny, and Patterson, Belknap, Farmer & Shibley, Washington, D. C., for Bituminous Coal Operators' Ass'n, Inc., amicus curiae.

Before BREITENSTEIN, McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This case concerns the Federal Coal Mine Health and Safety Act of 1969, and concerns the provisions of the Act requiring payment of short-term compensation to coal miners idled by a mine closure. 30 U.S.C. § 801 et seq. The Board of Mine Operations Appeals held that the miners in question were entitled to such compensation. CF&I Steel Corporation has now petitioned this court for review of the Board's order.

CF&I operates the Allen Mine in southern Colorado. On November 10, 1972, a Friday, at approximately 1:00 P.M., a roof-fall occurred in the No. 1 entry of the 6th panel, east section of the mine, killing two persons. As was required by statute, CF&I officials at the mine promptly notified the office of the Mining Enforcement & Safety Administration that the accident had occurred, and an inspector from that office arrived at the mine site about an hour later. Although it is perhaps a bit unclear, it would nonetheless appear that CF&I had itself already removed all personnel from the mine prior to the arrival of the inspector. In any event, the inspector, after learning from the mine superintendent that there had been a roof-fall causing two deaths, issued an order closing the mine "pending the completion of an investigation to determine the cause of the accident, and means to prevent a similar occurrence." The order stated that an "imminent danger" existed, which required "all persons * * * to be withdrawn from, and to be prohibited from entering" the Allen Mine. The withdrawal order stated that it was issued under section 104(a) of the Act, 30 U.S.C. § 814(a). Future references will be to Code sections, rather than to sections of the Act.

The inspector's order was modified the next day, Saturday, November 11, 1972, to permit the recovery of a piece of machinery involved in the roof-fall, and on Monday, November 13, 1972, the order was further modified to allow the resumption of coal production in all sections of the mine except those sections using beams as the primary source of roof support. Meanwhile, from November 11 through November 14, 1972, an on-the-scene investigation of the roof-fall was conducted. In this regard the Mining Enforcement & Safety Administration found, in part, that the two miners were killed in the roof-fall because of the "failure of management to make a thorough evaluation of the adverse roof conditions." There was no finding, however, that CF&I had failed to follow the roof control plan then in effect at the mine, though CF&I was required to supplement its roof control plan, for the obvious reason that the plan itself had proven fatally inadequate. On Decem-

ber 4, 1972, the inspector vacated in its entirety the withdrawal order of November 10, 1972, stating that a thorough investigation had disclosed "that the cause of said accident was not the result of any failure on the part of mine management."

On December 26, 1972, Local Union No. 9856 of the United Mine Workers of America filed with the Secretary of the Interior an application for compensation on behalf of the miners who had been idled by the withdrawal order of November 10, 1972. 30 U.S.C. § 820(a). The total amount of compensation ultimately determined due was $3,850.35, and this amount is not now in dispute. CF&I, however, resisted the request for compensation on the grounds that although the withdrawal order stated that it was based on 30 U.S.C. § 814(a), the inspector had not complied with the procedural requirements of § 814(a), so that in reality the withdrawal order was one based on 30 U.S.C. § 813(f). The nub of this controversy stems from the fact that 30 U.S.C. § 820(a), under which the Union sought compensation, provides for short-term compensation for miners idled by a withdrawal order issued under § 814(a), but does *not* provide for such compensation where miners are idled by a withdrawal order issued under § 813(f).

Both the Administrative Law Judge and the Board of Mine Operations Appeals ordered that compensation be paid the idled miners, and CF&I now seeks review of the Board's order. We shall now examine the pertinent sections of the Act.

30 U.S.C. § 813(f) provides that in the event of any accident occurring in a coal mine, the authorized representative of the Secretary of the Interior under certain prescribed conditions "may issue such orders as he deems appropriate to insure the safety of any person in the mine * * *." It is apparently agreed that this section is broad enough to permit the closing of a mine upon the occurrence of an accident, if such under the circumstances be deemed "appropriate."

30 U.S.C. § 814 provides for mine closures under several different situations. We are here particularly concerned with subsection (a), which reads as follows:

(a) If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that an imminent danger exists, such representative shall determine the area throughout which such danger exists, and thereupon shall issue forthwith an order requiring the operator of the mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger no longer exists.

30 U.S.C. § 820(a) provides that miners idled by a closure order issued under § 814 shall be awarded compensation for their forced idleness. This section of the statute is at the heart of the present controversy, and is accordingly set forth in its entirety:

(a)[1] If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title, all miners working during the shift when such order was issued who are idled by such order shall be entitled to full compensation by the operator at their regular rates of pay for the period they are idled, but for not more than the balance of such shift. [2] If such order is not terminated prior to the next working shift, all miners on that shift who are idled by such order shall be entitled to full compensation by the operator at their regular rates of pay for the period they are idled, but for not more than four hours of such shift. [3] If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title for an unwarrantable failure of the operator to comply with any health or safety standard, all miners who are idled due to such order shall be fully compensated, after all interested parties are giv-

en an opportunity for a public hearing on such compensation and after such order is final, by the operator for lost time at their regular rates of pay for such time as the miners are idled by such closing, or for one week, whichever is the lesser. [4] Whenever an operator violates or fails or refuses to comply with any order issued under section 814 of this title, all miners employed at the affected mine who would be withdrawn from, or prevented from entering, such mine or area thereof as a result of such order shall be entitled to full compensation by the operator at their regular rates of pay, in addition to pay received for work · performed after such order was issued, for the period beginning when such order was issued and ending when such order is complied with, vacated, or terminated.

It is noted, then, that § 820(a) provides for compensation to miners idled by a withdrawal order issued under § 814 in several different sets of circumstances and for varying amounts. The first sentence in § 820(a), which directly pertains to the present case, provides that when miners are withdrawn from the mine by an 814 withdrawal order, they are entitled to compensation at their regular rate of pay for the period they are idled, but not for more than the balance of the shift in which they were idled.

The second sentence in § 820(a), which also has application to the present controversy, provides that if the withdrawal order is not terminated prior to the next working shift, the miners on that shift who are thus idled shall also be entitled to regular compensation for the period they are thus idled, but not to exceed four hours.

The third sentence in § 820(a) provides that where the withdrawal order is issued because of the "unwarrantable failure" of the mine operator to comply with a health or safety standard, the miners are entitled to regular compensation for lost time, or for one week, whichever is lesser. In this instance, however, the statute provides that com-

pensation is to be awarded only after the withdrawal order has become final, and all interested parties given an opportunity for public hearing.

The fourth sentence in § 820(a) provides for so-called double compensation when the mine operator fails to comply with any withdrawal order issued under § 814, such compensation to be for the period beginning when the order was issued, and ending when the order is either "complied with, *vacated*, or terminated." (Emphasis added.)

The precise question to be answered is whether the aforesaid § 820(a) requires payment of short-term compensation to coal miners idled by a withdrawal order issued under § 814(a), where, after investigation, the withdrawal order is subsequently vacated by the inspector, acting for the Secretary. We conclude that payment of such short-term compensation was the intent of Congress, and we so hold.

At the outset it should be noted that we are not here concerned with the situation where the mine operator obtains administrative review of an 814(a) withdrawal order under 30 U.S.C. § 815, and succeeds in having such order vacated as having been improvidently issued in the first instance. Whether in such instance the mine operator is still liable for short-term compensation to the idled miners is not before us. Here, CF&I did not seek administrative review of the withdrawal order. The fact that the withdrawal order in the instant case was vacated by the inspector prior to the expiration of the 30-day period within which the mine operator has the statutory right to obtain administrative review is not significant. Such does not render the matter moot. *See* Eastern Assoc. Coal Corp. v. Interior Bd. of Mine Op. App., 491 F.2d 277 (4th Cir. 1974), and Ziegler Coal Company, 1 IBMA 72 (1971).

■ Not having sought administrative review of the 814(a) withdrawal order, CF&I is foreclosed from contesting the validity of the issuance of the withdrawal order in the present proceedings

brought under § 820(a) to compel payment of short-term compensation to the miners idled by the order. Eastern Assoc. Coal Corp. v. Interior Bd. of Mine Op. App., 491 F.2d 277 (4th Cir. 1974). Hence, in the present proceedings we are not concerned with whether the inspector fully complied with all the procedural requirements of § 814(a) before he issued the withdrawal order. It is on this basis that we conclude that the narrow issue in the case is whether the order entered on December 4, 1972, vacating the withdrawal order previously entered, excuses CF&I from paying short-term compensation to the miners who were in fact idled by the order.

■ There is the suggestion that when the withdrawal order here involved was subsequently "vacated" by the inspector, such rendered the initial withdrawal order void *ab initio*. We do not agree. We are advised that, after investigation, withdrawal orders are frequently vacated and for a variety of reasons. However, in our view, the mere vacation of a withdrawal order does not necessarily mean that the initial withdrawal order issued improperly.

In the instant case the inspector in vacating his withdrawal order simply stated that his reason for so doing was that a thorough investigation of the two deaths indicated that the mine fall-in "was not the result of any failure on the part of mine management." Such order does not mean that the original withdrawal order was improvidently issued. This being the case, then, we are not here faced with the situation where the vacation order is entered because the withdrawal order was itself improperly issued. We are aware that it is the Union's position that even though an 814(a) withdrawal order be erroneously issued, and for that reason is subsequently vacated, either by the inspector himself or on administrative review, the obligation on the mine operator to pay short-term compensation under § 820(a) is unaffected by such vacation order. In the view we take of it, however, we need not consider that particular proposition at this time.

■ Accordingly, we hold that the fact that the inspector on December 10, 1972, vacated his earlier withdrawal order does not excuse CF&I from making short-term compensation payments to the miners idled by the withdrawal order. The last sentence in § 820(a) requires the mine operator to make double compensation payments if he fails to comply with a withdrawal order issued him by the inspector, with the provision that such payments are to run from the time the order is issued until the order is either "complied with, *vacated*, or terminated." (Emphasis added.) It would seem odd for Congress to require double compensation for noncompliance with a withdrawal order which is subsequently vacated, but excuse the operator from making less onerous short-term compensation payments at regular rates of pay where a withdrawal order is later vacated. We do not believe such was the intent of Congress. Certainly there is nothing in the statute itself to indicate that miners idled by an 814(a) withdrawal order automatically lose their right to short-term compensation if the withdrawal order is subsequently vacated.

■ CF&I further argues that to give the Act this interpretation would be to deny it procedural, if not substantive, due process. We do not believe such to be the case. As indicated, the mine operator has the right under the provisions of the Act to obtain administrative review of a withdrawal order. 30 U.S.C. § 815. CF&I did not avail itself of this administrative remedy. The argument that the Act requires CF&I to pay for services not rendered is unavailing. Under the circumstances, such does not offend due process. *See* Dean v. Gadsden Times Publishing Corp., 412 U.S. 543, 93 S.Ct. 2264, 37 L.Ed.2d 137 (1973), and Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952).

The order is affirmed.